All right. Our third case this morning is 21-2151 United States v. Anderson. Mr. Juarez. Good morning, Your Honor. And may it please this honorable court. I am Marcin Juarez on behalf of Mr. Anderson and the Federal Public Defender's Office of the District of New Mexico. We have invoked this court's power of review to correct the constitutional violations that were visited upon Mr. Anderson and resulted in his unlawful conviction and his unlawful sentence. The constitutional violations in this case begin at the very inception. Mr. Anderson was stopped on December 17th of 2019 in the city of Albuquerque after he had been seen talking to a woman and who the woman later reported to an officer that he had asked her some questions such as whether she had a boyfriend, whether she had money. The officer wrongly thought that that constituted harassment under the New Mexico statutes. The district court similarly erred in that judgment. We're talking about reasonable suspicion, aren't we, to what, you know, and the officer, you know, doesn't have to have a perfect understanding of what the New Mexico harassment law actually means, but he did know that she was upset. He did, she claimed that she, you know, raised three or four different avenues of approaching her in an objectionable way. You know, why couldn't a reasonable police officer think that there's, you know, maybe enough there to stop and ask some questions? Your Honor, principally because reasonable suspicion requires specific and articulable facts to justify that interference with his personal liberty. What was absent there was any facts indicating a pattern of behavior. And on top of that, any indication that a reasonable person... She told him no two or three times and she's, why wouldn't that be a pattern? There wasn't testimony that she told him no, Your Honor. There was testimony that she was, he was bugging her and that if he didn't walk away that she would call the police. The, Mr. Anderson did in fact walk away. Could there be a pattern involving just one individual? You're not, you're not saying that he would have had to harass two, two different people or this person independent with some, some separation? Correct, Your Honor. We're not saying that there needs to be two separate people, but what we are requiring or what we believe the one, an unwelcomed action on Mr. Anderson's part, some indication that a reasonable person would suffer substantial emotional distress on that part. And then Mr. Anderson continuing in some way that would be intended to annoy, harass, or offend that person. That is what's absent here, Your Honor, is that although the young woman may have found Mr. Anderson's comments or questions ungentlemanly, there was no indication that she had refused him and that he had persisted nevertheless. That is where the factual basis for the harassment fails and why the officer's justification for stopping Mr. Anderson on that basis constitutionally fails. Then we have the, the jaywalking ordinance also is, if we agree with you on that piece, then you have to overcome the investigation of the, under the jaywalking ordinance. Certainly, Your Honor, and that is equally problematic. The testimony was that Officer Daniels saw Mr. Anderson walking along the street paralleling the sidewalk. Now, this Honorable Court in Brewer v. City of Albuquerque, I believe it's footnote four, had already interpreted the roadway statute as excluding the shoulder or the berm and only including that area for vehicular travel. The United States' answer brief provides this Honorable Court with a still image of the lapel camera that was captured in this case. Now, the testimony that we have is that he was paralleling the sidewalk and walking along it, and that image is that we can see trash cans in that same area where he was testified to be walking towards. Now, if we were to construe that any person walking in the street at any point were a violation of that statute, then there would be reasonable suspicion as a violation to that ordinance, excuse me, as to any person that was putting their trash out at that point, and that's simply not what that ordinance prohibits. Now, I mentioned Brewer, and that's important because the District Court is presumed to know the law, and Mr. Anderson did, in his motion to suppress, oppose any basis for reasonable suspicion to stop Mr. Anderson in the first place. So, we believe on either one of those bases, the District Court was in error, and the stop did violate Mr. Anderson's constitutional rights. That error was compounded when it led to an unconstitutional terrorist stop. Now, as Your Honor doubtlessly knows, that the two bases for stopping Mr. Anderson in the first place were harassment and alleged jaywalking ordinance. Neither one of those are violent. The woman never alleged any threats on Mr. Anderson's behalf. Quite simply, there is no basis for inferring that Mr. Anderson was a threat to that officer at all. Now, what is equally problematic about that analysis and the District Court's error is that the officer interpreted Mr. Anderson raising his arms in a surrendering position as signs of nervousness and something that would get an inference of dangerousness. That is simply unreasonable and doesn't comport with the Fourth Amendment's requirements that we judge the record and the facts in reasonable light. Now, that should... Well, the frisk didn't lead to the discovery of a weapon at that point. Oh, my apologies, Your Honor. So, in fact, the weapon was found later after the officers concluded that he violated New Mexico law by failing to identify himself or lying about his identity. And that's when the gun was found. Well, Your Honor, I would disagree. First, in terms of the identity question, it's problematic because upon his approach, Officer Daniels asked if he had identification. And as this Honorable Court knows, under most of the City of Albuquerque, an officer is only allowed to ask for identification if there's reasonable suspicion to the underlying offense. However, beyond that, Your Honor, addressing the causation issue there, Terry v. Ohio speaks to the humiliation, the intrusion on bodily security that a pat-down begets. Now, it is minor and it only requires reasonable suspicion, but it is real. It is what protects us from walking down the street, from being told we fit the description, and being subject to being pat-down in front of our fellow citizens and perhaps our colleagues. Now, Mr. Anderson's response in that moment of humiliation and invasion on his bodily security is what led officers to handcuff him, which further led to the further questions about his So we do believe there is but for causation there, and there is doubtlessly a connection between the unconstitutional staff and constitution. If we disagree with you about whether there was reasonable suspicion that he committed jaywalking, so assume that there's reasonable suspicion for that, are the officers entitled to ask for a statute? Yes, Your Honor, and under this court's precedence. Okay. And, you know, again, I want you to clarify for me why the second frisk, which is when they discovered the gun, that was pursuant to an arrest under that statute. So, setting aside the first frisk, they discovered during the intent to arrest him for that, and that's when the gun was found. So really the first frisk, even if it was unconstitutional, wasn't the but-for cause of the discovery of the gun under the government's theory of the case. What's wrong with that? The problem is the sequencing, Your Honor, particularly the question of what's your name and asking for social security numbers, is that that came after the handcuffing, Your Honor, which was necessarily or was as a result of the unconstitutional pat-down and Mr. Anderson's response to that. Now, if we were to assume that there was reasonable suspicion for it and the officers were entitled to ask for it, that doesn't, I suppose there, Your Honor, is that it's just, it's problematic because, one, if there is no reasonable suspicion for either one of the preceding offenses, that under MOSIC the officers are not entitled to even asking for his ID. Now, then... But if we disagree with you on that, do you lose? Do you lose? If we disagree with you on reasonable suspicion either under harassment or the jaywalking, do you lose then? No, Your Honor, we contend that the Terry pat-down was still constitutionally problematic and the but-for causation of the discovery of the firearm. Now... I don't follow that. I guess I'm having the same confusion that whether there had been a Terry pat-down or not, the result would have been the same, which is he would have given a false identity, they would have run it, they'd have found that out and they would have arrested him for that. Whether there had been a Terry or not, whether he was handcuffed or not, it would have all led to the same place. It could have, Your Honor, but we would refer to this part to the reasonable suspicion analysis that any invasion of that personal liberty must be justified as its inception and not what is subsequently learned. Now, it may subsequently be learned that, yes, that Mr. Anderson provided a false identification, that there may have been a warrant, but what was known at the time of the interference did not justify the interference itself and it was wrong from its inception. Now, aside from the Fourth Amendment issues, there is also the equally problematic due process issue that we raised at sentencing. Now, Mr. Anderson was sentenced and had his guideline range enhanced by nearly 50% based on unadmitted police reports that were not independently determined to be reliable. Once we had objected to, one, the addition of the objections were made both in the sentencing objections as well as at oral arguments. Now, those objections do not merely contest the reliability, but they contest the accuracy as well, which is in proportion to this Court's recent decision in McDonnell. Do you meet McDonnell? Did he ever say, in fact, it was not methamphetamine? In fact, he said the opposite, right? He said, what's in my sock? Well, that's methamphetamine, but the other probably isn't. It's vape. Those were what was presented, Your Honor, in terms of at the suppression hearing. Now, the problem that we have here is that that was not addressed at the sentencing hearing, that Mr. Anderson specifically objected to the finding that it was methamphetamine at all. Two, when the United States... But he didn't say it wasn't. He said, your proof isn't good enough. You didn't do a lab test. Well, not only that, Your Honor, in the pre-sentence, or the objection to the pre-sentence report, Mr. Anderson did specifically object to the finding that it was methamphetamine at all. And then in the reply to the amended sentencing report, once again raised the due process objection. Doesn't McDonnell require that he say, that was not methamphetamine? That is a false statement. McDonnell only requires... Well, it does require to challenge the truth or falsity of it, but it's more particularly the accuracy of it, as distinguished from the reliability. And we would contend that that's what was met here. By denying that it was methamphetamine was there, and it met the McDonnell standard. Beyond that, we have unadmitted police reports that were not found to be independently reliable as due process requires, and that was compounded by the United States misinforming the court that there had been testimony as to the presence of methamphetamine. All of those combined, that ultimately resulted in Mr. Anderson being sentenced to 51 months of incarceration in the BOP. We believe that that is all violative of the Constitution, both the due process guarantee, and the Fourth Amendment's guarantee to be free from unreasonable searches and seizures. I have reserved the remainder of my time. Thank you. Thank you, Counsel. May it please the Court, Counsel, good morning. My name is Fred Federici. I'm an Assistant United States Attorney from the District of New Mexico, and it is my privilege to be able to speak to you this morning on behalf of the people of the United States. Your Honors, with due respect to my appeal, are either unsupported by this record or unsupported by the law or both, and I would point to the first example of that being the factual predicate that Counsel just spoke about to support his first argument to the effect that their claim being that Sergeant Danius testified that he'd witnessed the defendant walking on the shoulder of the street when he stopped the defendant, and that's a claim that's repeated throughout the brief in chief. And then in his brief, the inconvenient fact that the street upon which the defendant was arrested actually had no shoulder. The defendant quietly abandoned that claim, and he has now switched to arguing that it's undisputed, his word, that the defendant was walking right next to the sidewalk on the edge of the road, not on the portion of the road where vehicles normally travel. On page eight of the reply, the defendant has expanded that to say that it makes no difference whether the defendant was, it makes no difference whether the edge of the street where Mr. Anderson was walking is more properly called a gutter rather than a shoulder. But the insurmountable factual problem for the defendant making these factual assertions is that they're restricted by the record that was developed below, and most obviously, for example, in this case, the record indicates that Sergeant Danius never testified that he'd observed the defendant walking on the shoulder of the street before he never uttered the word shoulder during his testimony. And the lapel camera footage, of course, as we point out in our brief, shows that the street had no shoulder upon which the defendant could have been walking. Sergeant Danius also never testified that he saw the defendant walking in the gutter. So what Sergeant Danius instead testified was that he, was that I observed that he was just walking in the street, and he continued walking in the street for the whole entire city block. He also testified that I observed Mr. Anderson walking along the right side of the street along the sidewalk. He also explained at the hearing that walking in the street instead of the sidewalk was a violation of the sidewalk ordinance, and that he was authorized to cite the defendant for that violation that he witnessed. Before we get to the frisk, I think you've covered reasonable suspicion from your perspective on the jaywalking. On the harassment, do we have a pattern here? I think counsel makes a pretty good argument that, you know, this kind of one-off conversation is as objectionable as it might have been. It doesn't really constitute a pattern that the New Mexico statute clearly contemplates. So I think your Honor anticipated or understands well our position, which is we don't think that the court needs to get to that question. However, we do believe that the district court got it right, and with respect to the facts that led to the court to find reasonable suspicion for harassment, what we had was a young woman who appeared to be frightened, who waved down a police officer, at which point the defendant was observed quickly walking away. The young lady was in a high crime area. The woman told Sgt. Danius that the man had been harassing her, her work, that he'd been asking her for money, asking her for her number, asking her if she had a boyfriend, and that he wouldn't leave her alone. So the pattern was the sequential questioning? Your Honor, I think that what we've got is it appeared to be a case of unwanted sexual harassment, and the pattern would have been, I think, repetitive behavior, badgering someone repeatedly, and there's certainly no case law that's been cited or that we found that suggests that that wouldn't constitute a pattern for purposes of the New Mexico harassment statute. I couldn't find any New Mexico law interpreting that provision, did, have you? No, Your Honor. Well, it is a criminal statute. At what point did it become a pattern? At some point it must have become a pattern. When was that? Your Honor, I just think we don't have a lot of facts to draw from. I think I've encapsulated the facts that are there, and I think that Judge Riggs' view of it, that what we're looking at was the relatively low standard of reasonable suspicion, is that based on defendants not leaving this young lady alone to the point where she felt frightened and compelled to wave over a police officer was enough to justify him following up on her. We know what a classic pattern is, which is somebody is following someone home from work day after day or that. It's not all in one episode that I don't know how long it lasted, one minute? We don't know that, Judge. And that, since it is a criminal statute, seems like you're asking for an awful lot there. Your Honor, I would agree that there's better examples of patterns, but we think that this gets across the reasonable suspicion threshold. I'd like to just briefly circle back to one part of the sidewalk ordinance, and that's with respect to the record that was developed. I do think that I'd like to make clear that the defendant never asked Sergeant Danius any types of questions like, where exactly did you see the defendant walking in the street? Did you see him walking along the sidewalk for the entire distance of the entire city block where you saw him? Did you see him walking in the gutter? Or was he walking on a part of the street where vehicles ordinarily travel? These questions were never asked. That record was never developed. And the reason for that was because the defendant's argument below was on selective prosecution. And I'll just note some points in the record that make that clear. In Volume 1, the record, page 35, and on Volume 1 of the record on pages 76 through 81, the argument was about selective prosecution. It was not a challenge to whether the defendant had actually violated the ordinance. That's the reason we're having difficulty in terms of dealing with this issue on appeal, because it's a new argument. And just to close that, our position on that is litigants don't get to head fake trial judges by arguing one thing below, in this case, racial profiling, and then complaining on appeal that the trial court erred because the court didn't rule in their favor on an argument they didn't make. I did look at the body cam footage, and it certainly escalated quickly from a jaywalking conversation to a frisk. What's the best argument that he was armed and dangerous? Well, Your Honor, I think our real response to that, again, is that it really doesn't matter in this case, because there is no but-for cause between the pat-down frisk that occurred and the subsequent discovery. Are you conceding that there was not sufficient factual evidence for armed and dangerous? We're not conceding that, Your Honor. What I recognize is it's not our strongest argument. Obviously, Sergeant Danius testified that in his eight years of experience patrolling the streets in that area, that the response that he saw of the defendant raising his hands to his chest was not something he'd ever seen before, and that struck him as something that was suspicious. He'd seen the defendant walk off quickly when he'd been waved over as a police officer, and he was in a high-crime area, among other things. He was also wearing bulky clothes, and we've cited the Supreme Court case that talks about the fact that officers on the street don't always know what they're facing. So we do think that the judge got that right, too. But the bigger point is that the pat-down frisk is a bit of a red herring here. And it's also based on, I will say this, it's an inescapable fact on this record, based on Sergeant Danius' lapel camera, that almost immediately after getting out of his car to encounter the defendant, he asked the defendant within 30 seconds whether he had any identification on him. He was entitled to do that because, as Your Honor suggested, he'd witnessed the defendant commit this violation, which meant that he was entitled to stop the defendant, to identify the defendant, and to cite the defendant. And what happened from there is really a story of what the defendant was doing in reaction. But the defense briefs are based on the false suggestion that Sergeant Danius somehow only became interested in figuring out the defendant's identity after the quick pat-down, in which they didn't find the gun that was tucked into his waistband. And that's the brief in chief on pages 16 and 34. And then based on that false premise, the defendant then reaches even farther to claim that the defendant's encounter with the officers was unconstitutionally prolonged, based on their failure to find the gun, so that they could identify the defendant without having any grounds to ask the defendant about his identity. Now, the reality of the situation is this. The defendant knew the moment that the officer first asked him about his identity that he couldn't answer that question truthfully. He knew that he had an outstanding felony warrant. He knew that he had a loaded gun in his waistband. So, if anything, it was the defendant's own cat and mouse games trying to deflect questions about his identity throughout his encounter with the officers that were the cause of any prolonging of the encounter. And in fact, the defendant stuck to his ruse about his identity even after they'd gotten him back to the police station. So, both at the district court level and here before this court, the defendant has consistently failed to articulate any colorable connection or argument as to how the officer's failure to locate the gun in the initial pat-down search. Why couldn't we interpret the lead? There was evidence that he was armed and dangerous that would justify the frisk. Why didn't that unconstitutionally prolong the stop? Because it interfered with the normal police activity of trying to obtain his identification. So, you know, without that, there would have been a different sequence of events, and it may not have led to the discovery of the firearm. I don't think so, Judge, because it's pretty clear from Sergeant Danius' testimony that he was going to identify who this defendant was. And he said that in his testimony that it's, you know, police work 101. So, and it's clear from the lapel camera that that was what his initial approach was. So, I think it played out, it was going to play out to the point where he was successfully able to identify the defendant. The defendant decided to take a different road for the reasons I discussed, and that then led him to be in charge for concealing his identity that was the direct cause of why they found the gun. Your Honors. But it did extend the stop. I hadn't really thought of that. Had they not padded him down, the stop would have been faster the first time, padded him down the first time. But it's not the but-for cause of what was found. But there is a rule from the Supreme Court that you can't unnecessarily extend a stop. That's true. It's not, that's, it's a new argument that the defendant hasn't made. But I think it's still not the but-for cause as to how this, how this unfolded. Your Honors, I've got one minute. I wanted to address one thing before I close, and that is with regard to the reference to, to the misstatement that my colleague made below. I just want to do, add one, one portion of that. And I do that because my colleague's not here to speak for himself. So, I just want to say one thing. I think the was the context of when, of how it arose that, when my colleague misspoke. And that was during the December 7, 2021 sentencing hearing. He was responding at the time to this belated 11th hour claim that had come in terms of asking for sanctions due to an alleged discovery violation. And in that context, what he said to the court was, look, court, this has been an issue. The defendant's knowledge and connection to drugs with this firearm has been at issue since the inception of this case to include, and this is where he misspoke, during the testimony of the officer. In fact, it was just based on the exhibits that were attached there too. But that did have, that had, that statement had nothing, based on this record, on what, how the judge finally ruled on that issue in terms of the lateness of the objection that was raised. Instead, what the court said and asked the counsel was, why didn't you raise this further earlier? His answer was, because I didn't know until today that the court, that the government was going to rely on the field test. And the court responded, well, that was disclosed in the pre-sentence report in September. So the court summarily rejected that argument. It had nothing to do with the statement that my colleague made. And with that, I see that my time is about to expire. So counsel, we appreciate your arguments. Counsel are excused and the case shall be submitted. Thank you, Your Honor. Did you want your rebuttal time? If I may. You may. I thought, I thought when you sat down, you said you were ceding it, but would you give him one minute, please? Thank you, Your Honor. And I can make this brief. Your Honor, to the extent the United States asserts that we failed to develop the record that Mr. Anderson wasn't, or walking in the shoulder, our obligation is to merely show that the Fourth Amendment is implicated. It is the United States' burden of proof and persuasion to show that the Fourth Amendment is complied with. All the United States had to ask was, is Mr. Anderson walking in the path of where vehicles normally travel? And an affirmative answer to that would have given them reasonable suspicion. The United States did not ask that question. And it was not incumbent upon Mr. Anderson to ask that question. It was incumbent on the United States and they failed to do so. Now, to the extent that the government raises the raising of the arms. Now, both United States v. Sokolow and United States v. Salzano indicate that both nervousness is very low on the reasonable suspicion scale, but Sokolow indicates it's not whether a particular activity is guilty or innocent, but the degree of suspicion that attaches to that. And what degree of suspicion can attach to a man raising his arms and surrendering? Thank you. Thank you, counsel. You are now excused and the case is now submitted.